IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA SHAFFER, | ) | CASE NO.  1:23-CV-01398 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | **MEMORANDUM OF** |
| ADMINISTRATION, | ) | **OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Paula M. Shaffer ("Plaintiff" or "Shaffer"), challenges the final decision of Defendant,

Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a

Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant

to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is **AFFIRMED.**

## I.      PROCEDURAL HISTORY

In May 2019, Shaffer filed applications for POD, DIB, and SSI, alleging a disability onset date of

March 7, 2012 and claiming she was disabled due to "profound hearing loss, supraventricular tachycardia,

severe degenerative arthritis, and brief episodes of decreased awareness – possible seizures." (Transcript

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

1

("Tr.") at 78.) The applications were denied initially and upon reconsideration, and Shaffer requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 114.)

On September 1, 2022, ALJ Eric Westley held a hearing during which Shaffer, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 55-76.) On September 23, 2022, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 16-27.) The ALJ's decision became final on May 19, 2023, when the Appeals Council declined further review. (*Id.* at 1-12.)

On July 20, 2023, Shaffer filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 8, 11.) Shaffer asserts the following assignments of error:

> (1) The ALJ failed to consider all the ways in which Shaffer's hearing impairment would affect her capacity to work.
>
> (2) The ALG failed to incorporate the limitations caused by Shaffer's severe degenerative arthritis into her assigned residual functional capacity.

(Doc. No. 8.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Shaffer was born in 1971. (Tr. at 26.) She was 41 years-old at the alleged disability onset date, defined as a "younger individual" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). As she was 51 years-old at the time of her administrative hearing, she changed age categories to "closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). She has a high-school education. (*Id.* at 60.) She has past relevant work as a cashier. (*Id.*)

**B.**     **Relevant Medical Evidence[2]**

    **1.**     **Hearing Loss**

Shaffer initially received hearing aids in 2005. (Tr. at 64.) During an October 2011 hearing evaluation, she expressed difficulty hearing co-workers, customers, and environmental sounds. (*Id*. at 580.) Results suggested a "mild to moderate sensorineural hearing loss in the low frequencies, a moderately severe sensorineural loss in the mid frequencies, and a profound loss in the highest frequencies for both ears, with the right ear being slightly worse than the left." (*Id*.) After having the power increased on her hearing aids, she reported "good sound quality" but she was recommended to get newer hearing aids. (*Id*. at 580, 583.) Her speech discrimination score in her right ear had decreased compared to a previous March 2005 hearing evaluation, and her provider opined that newer hearing aids would improve speech intelligibility as well. (*Id*.) The provider suggested co-workers utilize "communication strategies," including getting Shaffer's attention prior to speaking, moving closer, looking straight at her when speaking, speaking clearly, and eliminating background noise. (*Id*. at 581.) To ensure Shaffer was able to detect alarms or buzzers, the use of a connecting flashing light was also suggested. (*Id*.)

Shaffer did not report any change to her hearing during unrelated examinations for her ankle in April 2017 or in September 2018. (*Id*. at 393-394, 415-416.) In April 2019, Shaffer underwent another audiologic evaluation. (*Id*. at 320.) At that time, she reported she had not been wearing the hearing aids because they needed to be repaired. (*Id*.) Mild sloping to profound sensorineural hearing loss was reported but it was also noted "patient was somewhat difficult to test." (*Id*.) A moderately-severe loss for speech reception and "very poor" word recognition score were also noted. (*Id*.) During a May 2019 follow up

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the issues raised in the parties' Briefs.

evaluation, the provider noted that she still needed new hearing aids, as the old ones broke. (*Id*. at 573.) She appeared alert, well-developed, oriented, and exhibited normal voice and communication. (*Id*. at 574.) Cochlear implants were also discussed, but Shaffer has declined moving forward with them. (*Id*. at 64, 575.)

### 2.    Degenerative Arthritis

Prior to her disability onset date, in May 2005, Shaffer underwent x-rays of her left ankle, revealing degenerative disease and osteophytes around the ankle. (Tr. at 354.) As early as August 2011, she was treated regularly for lower back and ankle pain by the Pain Relief Center. (*Id*. at 773-799.) Shaffer reported aggravating factors such as walking or climbing stairs. Pain management included prescriptions for oxycodone and ibuprofen. (*Id*. at 822-919.) Records indicate the medication effect was "good," "effective," "fair," or "help[ed] most of the time." (*Id*. at 825-826, 832, 837, 839-840, 845, 847-848, 852, 855, 860-861, 863, 864-866, 868.)

In April 2017, Shaffer sought evaluation for bilateral foot and ankle swelling. (*Id*. at 415.) She reported a history of ankle swelling but was now having swelling to the tops of her feet and shins. (*Id*.) She further reported sitting more than usual and weight gain, as well as not drinking enough water, still smoking, and eating a sugary diet. (*Id*.) Her provider suspected fluid retention or vascular insufficiency, advising her to consult vascular medicine. (*Id*. at 416.)

Shaffer was seen for chronic ankle and lower back pain again in January 2018. (*Id*. at 622.) X-rays revealed mild degenerative changes in the facet joints lower lumber spine and well-preserved disc spaces. (*Id*.) They showed good vertebra alignment with flexion and extension and no fracture or dislocation. (*Id*. at 622-623.)

She was seen again for bilateral foot swelling in July 2018. (*Id*. at 398.) She reported the left side of her left foot had been numb for the past month, but now it felt as if the whole bottom of her foot and

4

toes were numb. (*Id.*) She reported keeping off her feet and had attempted utilizing compression socks but felt they were too hard to put on and take off. (*Id.*) During a physical examination, her feet showed normal distal pulses and were sensitive to 10 gm monofilament, and calluses were noted bilaterally to the soles and balls of her feet. (*Id.* at 399.)

In September 2018, Shaffer was seen again for ankle swelling and numbness. (*Id.* at 393.) She reported the addition of a water pill into her daily medications made the swelling better. (*Id.*) She stated she had numbness on the bottom of her left foot for about four months and foot pain but felt "she has no trouble walking." (*Id.*) She also reported foot pain. (*Id.*) A physical examination revealed pitting edema in both legs and tenderness in her lower spine. (*Id.* at 394.) Imaging revealed marked narrowing of her subtalar joint. (*Id.*) Her provider opined that the left foot numbness may be associated with her lateral and/or medial plantar nerve (tibial nerve). (*Id.* at 395.)

That same month, x-rays of her left foot indicated "severe degenerative changes of the posterior and middle subtalar joints with sclerosis and subchondral cysts and joint space narrowing." (*Id.* at 620-621.) Os trigonum was found to be present with pseudarthrosis with the calcaneus. (*Id.*) Degenerative changes in the left ankle joint, a heel varus, and a tiny enthesophyte at the insertion of the plantar fascia on the calcaneus were also noted. (*Id.*) The record indicates "severe arthritic changes to some joints" in her foot, and she was told to follow up with a podiatrist. (*Id.*)

In October 2019, Shaffer reported sciatic pain extending down right leg to the knee. (*Id.* at 660.) The assessment suggested sciatica on the right side and a course of prednisone treatment was discussed. (*Id.* at 660-661.)

A January 2020 imaging of Shaffer's lumbar spine, hips, and ankles indicated satisfactory alignment of vertebral bodies, preserved vertebral body height and disc space, and unremarkable soft tissue structures. (*Id.* at 664, 667.) There was moderate narrowing of the right hip joint with subchondral sclerosis,

5

cysts and osteophytes indicating moderate degenerative joint disease, but her left hip appeared unremarkable. (*Id*.) Both ankles revealed plantar calcaneal enthesophytes, but her left ankle showed subtalar degenerative joint disease with joint space narrowing, subchondral sclerosis and subchondral cyst formation. (*Id*. at 668.) Her right ankle appeared otherwise unremarkable. (*Id*.)

During an April 2020 phone call for a medication refill, Shaffer reported stable intermittent edema and intermittent right-sided sciatica from the buttock area down to the knee. (*Id.* at 653.) She was prescribed a short course of prednisone. (*Id*.)

## C.     State Agency Reports

### 1.     Physical Impairments

In July 2019, state agency reviewing physician Mehr Siddiqui, M.D., found Shaffer capable of performing limited work. (Tr. at 84-85.) Specifically, Dr. Siddiqui opined that Shaffer could occasionally lift, carry, or pull 50 pounds, and could frequently lift, carry, or pull 25 pounds. (*Id.* at 84.) Shaffer was limited to standing and/or walking approximately six hours in an eight-hour workday and sitting for six hours out of an eight-hour workday. (*Id.*) She was further restricted from climbing ladders, ropes, or scaffolds, working at unprotected heights and commercial driving due to reported seizures, and noisy working environments due to "mild or profound hearing loss." (*Id.* at 84-85.) She was given a limitation with respect to her hearing, but no limitations were assigned to her ability to speak. (*Id.*)

Upon reconsideration in December 2019, state agency reviewing physician Dr. Bekal found that Shaffer could occasionally lift, carry, or pull 20 pounds, and could frequently lift, carry, or pull 10 pounds, but otherwise reaffirmed all the findings from the initial review. (*Id.* at 96.)

## D.     Hearing Testimony

During the September 1, 2022 hearing, Shaffer testified to the following:

- **Impairments**: She has a hard time communicating effectively due to difficulties hearing and distinguishing words or specific pitches. She has been using hearing aids since 2005 but does not have interest in pursuing cochlear implants. Arthritis developed following the birth of her daughter at age 18, causing pain her lower extremities when she stands. She was diagnosed with tachycardia, experiencing rapid heart rates when lifting objects, which necessitates medication and rest to alleviate symptoms. Occasionally, she encounters blackouts. She has reported heart-related issues throughout her life and has undergone testing since around the age of ten.

- **Daily Living**: She resides with her disabled husband. Her most recent employment was as a cashier at Aldi's, ending in March 2012. During this role, she occasionally lifted to 20 pounds. Due to experiencing blackouts, she was placed on medical leave and was unable to return without medical clearance, which she did not obtain. She mentions difficulties hearing fire alarms or phones but can manage phone conversations if the other person speaks loudly, clearly, and slowly. She can understand speech when individuals face her directly and articulate clearly, and she relies on captions to comprehend television.  Her daughter and husband assist her by speaking loudly and slowly, and her daughter often accompanies her to medical appointments. They also aid her with bill payments. She can perform some household chores but experiences pain in her legs, back, and feet if standing for prolonged periods. She can stand approximately five minutes, and walking is challenging. Although she does not presently use a case, she plans to acquire one.

(Tr. at 61-70.)

The Vocational Expert ("VE"), Deborah Lee, testified that Shaffer had past work as a cashier and checker. (*Id.* at 71.)  The ALJ then posed the following hypothetical questions:

1. "I'd like you to assume a hypothetical individual at that job that you just described. I'd like you to further assume that this individual is capable of light work, however, they can never climb ladders, ropes, or scaffolds; they cannot tolerate a loud or very loud work environment, and they must avoid exposure to hazards such as unprotected heights, moving machinery, and commercial driving. Could this person perform Ms. Shaffer's past work?"

The VE testified that "yes, the noise level for that particular position is consider [sic] moderate, which would be – is described as like office, grocery store, so it does comply in not having a loud or very loud environment."  (*Id.* at 71-72.)  The VE affirmed that her testimony was consistent with the DOT. (*Id.*)

2. The ALJ then asked the VE to consider the same person but move the work to sedentary.

7

The VE testified the hypothetical individual would not be able to perform Shaffer's past work as a cashier and there were no transferable skills to sedentary. (*Id.* at 72.)

   **3.**   The ALJ then asked the VE to consider a hypothetical person limited to light work but with limitations that the person cannot perform work that requires using the phone, can perform work that only requires rare communication with others, so they can be around others, but only rare communication, but they cannot interact with the public.

The VE stated the hypothetical individual would not be able to perform Shaffer's past work as a cashier. (*Id.* at 72.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaning, housekeeping, laundry folder, and merchandise marker. (*Id.* at 73.) The VE further noted there are no jobs that match this hypothetical, as the DOT does not define the term "rare" in relation to communication. (*Id.*)

   **4.**   The ALJ then asked the VE to consider the same individual as Hypothetical No. 3 but this person cannot engage in any communication that is required by the job.

The VE testified that "any communication" is not contained in the DOT, but based on "no communication at all," there would be no jobs to offer. (*Id.* at 74.)

Shaffer's counsel then questioned the VE. (*Id.* at 74-76.) Shaffer's counsel asked if the previously identified jobs would remain if he took the ALJ's Hypothetical No. 3 and modified it, so the employee received written instructions or orders. (*Id.* at 75.) The VE testified as follows:

> "You know, I – let me think how I want to say this. I believe the jobs would still remind [sic] because they are basically short demonstrations. Could you request that the employer give instructions in writing? They are not normally given in writing, so it would either be through demonstration, or I think simple writing. That might be considered an accommodation if you asked an employer to right [sic] out the instruction."

Opining further, she stated:

> "Well, I mean – would it be considered an accommodation? It could be in these jobs, because I think writing out how to fold something could be complicated versus

showing them, so you might have an employer who might not want to do that, so it
could be an accommodation."

(*Id*.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of
disability and must prove an inability to engage "in substantial gainful activity by reason of any medically
determinable physical or mental impairment," or combination of impairments, that can be expected to "result
in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."
20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the
claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date
the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y
of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet
certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-
stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d
504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must
demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability
application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from
a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A
"severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work
activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has

a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Shaffer was insured on the alleged disability onset date, March 7, 2012, and remained insured through December 31, 2017, the date last insured ("DLI").  (Tr. at 18.) Therefore, in order to be entitled to POD and DIB, Shaffer must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant met the insured status requirements under the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since March 7, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: hearing loss not treated with cochlear implants; obesity; degenerative changes of the left foot; and mild degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

10

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can never climb ladders, ropes, or scaffolds; cannot tolerate a loud or very loud work environment; can perform tasks that require occasional communication but no telephone work or interaction with the public; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February **, 1971 and was 41 years old, which is defined as a younger individual aged 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residential functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569), 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 12, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 18-27.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).

Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

12

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Shaffer presents two issues for this Court's review. First, she argues that the ALJ erred by failing to consider the multiple ways in which her hearing impairment affects her capacity to work. (Doc. No. 8.) Second, she asserts that the ALJ erred by failing to incorporate the limitations caused by her severe degenerative arthritis into her assigned residual functional capacity. (*Id.*) The Court addresses each of these arguments in turn.

### A. The ALJ considered the ways in which Shaffer's hearing impairment affects her capacity to work.

In her first assignment of error, Shaffer argues that the ALJ overlooked various ways in which her hearing impairment affected her capacity for employment. (*Id.* at 8.) She asserts her difficulty in comprehending spoken language unless the speaker directly faces her, citing her disability hearing where the ALJ had to face her and repeat questions. (*Id.* at 10.) The ALJ determined Shaffer's hearing loss would not prohibit her from employment requiring more than "occasional communication" with coworkers and that she could not utilize a telephone at work or interact with the public. (Tr. at 21.) Because of this, Shaffer argues this notion of gainful employment is not a realistic representation of her functional capacity because

13

she would likely require all verbal communications given to her directly face to face and repeated several times. (Doc. No. 8 at 10.)

The Commissioner responds that substantial evidence supports the ALJ's decision and that the ALJ relied upon the objective medical evidence and prior administrative findings, the only opinion evidence submitted regarding Shaffer's hearing-related limitations. (Doc. No. 11 at 5.) The Commissioner highlights out the ALJ noted Shaffer had reported good sound quality with her hearing aids during a 2011 audiology exam. (*Id.*) The ALJ further noted that Shaffer had reported no change in hearing during a 2017 and 2018 unrelated examination. (*Id.*) Additionally, the ALJ discussed that while Shaffer failed to be compliant regarding the replacement of hearing aids, she nonetheless appeared to exhibit normal communication during a 2019 examination. (*Id.* at 5-6.) The Commissioner also asserts that Shaffer fails to point to any opinion evidence or objective evidence regarding her hearing limitations; rather, she relies own testimony regarding her difficulty in hearing and frequent requests for repetition. (*Id.* at 7.)[3]

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all the claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

---

[3] The Court notes Shaffer fails to challenge the ALJ's subjective symptom evaluation on judicial review. (Doc. No. 8 at 10-12.)

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-

15

2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The Court concludes the ALJ appropriately relied upon the objective medical evidence and prior administrative medical records, as well as Shaffer's own testimony during her disability hearing and the medical opinion evidence, in determining the RFC. (Tr. at 16-27.) Despite finding the subjective information provided by Shaffer's former employer lacking in persuasiveness, the ALJ took it into consideration. (*Id*. at 24-25.) The ALJ noted that Shaffer reported good sound quality in October 2011 with Siemens biaural hearing aids. (*Id*. at 22.) She appeared to communicate normally at later unrelated physical exams, despite audiologic evaluations suggesting mild sloping to profound sensorineural hearing loss and a moderately-severe loss for speech recognition. (*Id*. at 23.)

The ALJ also took note that at a 2019 audiologic evaluation, Shaffer reported to not be wearing her hearing aids due to the need for repairs. (*Id*. at 23.) During a follow appointment in May 2019, she reported still not having her hearing aids repaired (*Id*. at 573.) No reason for non-compliance was offered at this appointment. (*Id*.) If a claimant fails to adhere to prescribed treatment without valid justification, SSA regulations suggest they will not be deemed disabled. See 20 C.F.R. § 404.1530(b). The ALJ noted that she exhibited normal communication during this appointment. (Tr. at 23.)

The Court will follow the logical progression of the ALJ's decision, particularly in light of the ALJ's imposition of more restrictive limitations on Shaffer's RFC than suggested by the medical record. (Tr. at 26.) "Reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence." *Garcia*, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023). As the Commissioner

16

points out, there is no medical record or opinion evidence suggesting the assertion that Shaffer is more limited than the ALJ found. (Doc. No. 11 at 6.) The ALJ properly based his determination of Shaffer's hearing impairment on the medical evidence within the record. See *Ortman v. Comm'r of Soc. Sec.*, No. 2:14-CV-1900, 2016 WL 2595111, at *2 (S.D. Ohio May 5, 2016).  And the findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

The Court must defer to an ALJ's findings if they are supported by substantial evidence, even if substantial evidence also supports the opposite conclusion. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 604-05 (6th Cir. 2009); *see also O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (*quoting Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003)) ("the Commissioner's decision still cannot be overturned so long as substantial evidence also supports the conclusion reached by the ALJ.") The ALJ thoroughly considered Shaffer's hearing loss by reviewing the entire medical record and evidence submitted to determine her RFC. In doing so, he acknowledged Shaffer's ability to perform the full range of light work was "impeded by additional limitations." (Tr. at 26.) To account for these limitations, the ALJ posed several hypothetical questions to the VE regarding the existence of jobs in the national economy given these constraints. (*Id.*) The VE rendered the opinion that alongside Shaffer's other impairments, she would nonetheless be able to make a successful adjustment to other work. (*Id.* at 27). Shaffer's argument that the ALJ failed to assess the combined impact of her hearing loss on her work ability lacks substantiation.

The Court finds there is no error.

**B.  The ALJ accounted for the limitations caused by Shaffer's severe degenerative arthritis into her assigned residual functional capacity.**

In her second assignment of error, Shaffer argues that the ALJ failed to incorporate the limitations caused by her severe degenerative arthritis into her assigned RFC. (Doc. No. 8 at 10.) She points out the arthritis in her lower left extremity is classified as a "severe" impairment by Dr. Siddiqui, the state agency reviewing physician. (*Id.*) She maintains that while Dr. Siddiqui acknowledged the restrictive impact of severe arthritis on her capacity to work, he did not incorporate this limitation into his assessment of her RFC. (*Id.*) Shaffer contends the RFC implies she has no limitations regarding her capability to perform the standard six to eight hours of standing and walking that are typically seen in jobs classified as "light". (Doc. No. 8 at 10.) These findings were reaffirmed by Dr. Bekal upon reconsideration.[4] (*Id.*)

The Commissioner asserts substantial evidence supports the ALJ's analysis of Shaffer's limitations. (Doc No. 11 at 7.) Pointing to Social Security Ruling 83-10, which states "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," the Commissioner argues that the objective evidence in the record and the findings by the state agency reviewing physicians are consistent. (*Id.*) The Commissioner further asserts that the ALJ also pointed to several instances throughout the medical record where Shaffer appeared to exhibit a normal gait and station, strength, muscle tone, reflexes, sensation, and coordination in her legs, no deformities, clubbing, or cyanosis in her legs or feet, and normal range of motion in her hips, knees, and spine, and no tenderness. (*Id.* at 8.)

---

[4] Again, the Court notes Shaffer fails to challenge the ALJ's subjective symptom evaluation on judicial review. (Doc. No. 8 at 10-12.)

18

## I.  Dr. Siddiqui's Medical Opinion

Shaffer points out that Dr. Siddiqui, the social security reviewing physician tasked with initially reviewing her functional capacity, opined that the arthritis in her lower left extremity constituted a "severe" physical impairment. (Doc. No. 8 at 10.) Shaffer asserts that Dr. Siddiqui failed to incorporate his finding of a "severe" physical impairment into the limitations placed on her capacity to work. (*Id.* at 10.) This finding was reaffirmed by Dr. Bekal upon reconsideration. (Tr. at 90-100.)

Since Shaffer's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[5] (2) consistency;[6] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with

---

[5] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[6] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.
>
> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr. Siddiqui's opinion as follows:

> The State Agency consultants are found to be persuasive. [T]hey opined that the claimant would be capable of a less than light exertional level, and with no climbing of ladders, ropes, or scaffolds. Due to reported seizures, should avoid working at unprotected heights. Due to mild to profound healing [sic] loss should avoid noisy working environment. Should avoid working around dangerous machinery [sick] no unprotected heights no commercial driving. (See 1A and 3A). This is consistent with the record, which does not support mental limitations based on the stable ADHD findings. Physically, objective imaging showed mild degeneration, and physical exams were generally normal. While the consultants noted "seizures" for some environmental limitations, those limitations are still supported by the claimant's combination of physical impairments, including her BMI which was around 33. Additionally, the consultants have program knowledge, as well as supportability with the record. [F]or these reasons, they are found to be persuasive.

(Tr. at 24.)

The ALJ specifically addressed supportability and consistency in evaluating the state agency reviewing physicians' opinions.

In addition, elsewhere in the RFC analysis, the ALJ found as follows:

> A physical exam was recorded in April of 2017. It noted the claimant was well-appearing, well hydrated, and well-nourished. Normal abdominal exam was noted. Abdomen was soft, nontender. Bowel sounds were normal. No masses, organomegaly. Negative CVA tenderness was noted. Extremities showed no deformities, skin discoloration, clubbing or

cyanosis.  Good capillary refill.  Negative Homans, no cord palpated bilaterally, and no redness or streaking.

Views of the lumbar spine were taken in January of 2018. They noted mild degenerative changes in the facet joints in the lower lumbar spine. The disc spaces appeared ell-preserved [sic]. The vertebrae were in good alignment.

…

The claimant presented in September of 2018 for ankle swelling and numbness. She feels the swelling is better is due to a water pill added to her medications. She has numbness on the bottom of her left foot for about 4 months. She noted that she had no trouble walking. (4F/15) … Lower extremities showed feet and toes were warm. Pitting edema in both legs. Few venous telangiectasias were noted in both lower legs. Musculoskeletal range of motion was normal in hips, knees, shoulders, and spine. No joint swelling, deformity, or tenderness was noted. (4F/16).

An x-ray of the left foot was taken in September of 2018. It noted severe degenerative changes of the posterior and middle subtalar joints with sclerosis and subchondral cysts and joint space narrowing. Os trigonum is present with pseudarthrosis with the calcaneus. There are degenerative changes of the ankle joint. Tiny enthesophyte at the insertion of the plantar fascia on the calcaneus. Heel varus was noted. (5F/53).

…

Views of the lumbar spine, hips, and left ankle were taken in January of 2020. The lumbar spine showed alignment of vertebral bodies is satisfactory. Vertebral body height and disc spaces are preserved. The soft tissue structures are unremarkable. The hips showed no acute fracture or osseous lesions are identified. There is moderate narrowing of the right hip joint with subchondral sclerosis, subchondral cysts and osteophytes indicating moderate DJD. The left hip joint space is preserved. The soft tissue structures are unremarkable. The left ankle showed no acute fracture or osseous lesions are identified. The ankle mortise is preserved. Plantar calcaneal enthesophytes are seen. There is subtalar DJD with joint space narrowing, subchondral sclerosis and subchondral cyst formation. (7F/23).

In April of 2020, the claimant stated she had stable intermittent edema.

…

In June of 2022, the claimant noted that her symptoms had worsened over the last year. It was note [sic] that her ADHD was stable. On exam, she was

22

in no acute distress. Pulmonary effort was normal. neck exam was normal. she was noted to have bilateral lower leg edema. (9F/45-48).

Concerning the claimant's obesity, the National Institute of Health (NIH) established medical criteria for the diagnosis of obesity in its *Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults* (NIH Publication No. 98-4083, September1998). These guidelines classify overweight and obesity in adults according to Body Mass Index (BMI), which is the ratio of an individual's weight in kilograms to the square of height in meters. However, pursuant to 19-2p, when evaluating obesity, we consider any functional limitations in the person's ability to do basic work activities resulting from obesity and from any other physical or mental impairment. If the person's obesity, alone or in combination with other impairment(s), significantly limits his or her physical or mental ability to do basic work activities, we find that the impairment(s) is severe. We find, however, that the impairment(s) is "not severe" if ii does not significantly limit a person's physical or mental ability to do basic work activities. No specific weight or BMI establishes obesity as a "severe" or "not severe" impairment. Similarly, a medical source's descriptive terms for levels of obesity, such as "severe," "extreme," or "morbid," does not establish whether obesity is a severe impairment for disability program purposes. We do an individualized assessment of the effect of obesity on a person's functioning when deciding whether the impairment is severe. (See Ex. 2F, 4F, 9F for BMI around 33). In this case, the claimant's obesity has found to significantly limit the claimant's ability to do basic work activities, and therefore, is severe.

In sum, the above residual functional capacity assessment is supported by both the subjective and objective medical evidence of record. After a thorough review of the evidence of record, including the claimant's allegations and testimony, forms completed at the request of Social Security, the objective medical findings, medical opinions, and other relevant evidence, the undersigned finds the claimant capable of performing work consistent with the residual functional capacity established in this decision.

(Tr. at 23-25.)

The ALJ acknowledged the "severe" degenerative changes in Shaffer's ankle as Dr. Siddiqui notes, but also pointed to several examinations throughout the record where Shaffer demonstrated a normal gait and station, coordination in her legs, and normal range of motion. (*Id.* at 22-23.) During her hearing, Shaffer testified that she intended to get a cane, but the record lacks a documented medical need for one. (*Id.* at 68.)

23

A 2018 x-ray of the lumbar spine showed only mild degenerative changes, but otherwise the vertebrae and disc spaces appeared unremarkable. (*Id*. at 22). This was again affirmed in 2020. (*Id*. at 23.) The ALJ also acknowledged that Shaffer reported "no trouble walking" during a September 2018 examination. (*Id*.) In April of 2020, she stated she her intermittent edema was stable and affirmed her capability to complete her work. (*Id*.) In addition, Shaffer reported "good" or "fair" pain management with medication. (*Id*. at 825-826, 832, 837, 839-840, 845, 847-848, 852, 855, 860-861, 863, 864-866, 868.)

The ALJ determined Shaffer's her ability to perform light work was further impeded by additional limitations. (*Id*. at 26.) The ALJ's decision indicates his acknowledgement of the severity of Shaffer's degenerative arthritis while taking note of the medical evidence where Shaffer reported the ability to walk and/or was found to have normal gait, strength, and range of movement in her lower extremities. (*Id*. at 16-27.) Although Shaffer alleges that the ALJ fails to bridge a logical gap between Dr. Siddiqui's RFC analysis and the limitations imposed on her, the Court disagrees. The Court must defer to the Commissioner's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Substantial evidence supports the ALJ's findings.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated: May 17, 2024.                          /s/ Jonathan Greenberg
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge

24